Argued February 7, affirmed May 22, petition for rehearing
denied June 18, 1963

SOUMIE ET AL *v.* McLEAN ET AL

382 P. 2d 1

*C. X. Bollenback,* Portland, argued the cause for appellants. With him on the brief was Ruth Rose Richardson, Portland.

*Richard E. Paul,* Portland, argued the cause for respondents. With him on the brief were Keith A. Caldwell, Dan J. Kenney, and Roscoe Watts, Portland.

Before McAllister, Chief Justice, and Rossman, Sloan, Goodwin and Lusk, Justices.

ROSSMAN, J.

This is an appeal by the plaintiffs-contentants from a decree of the circuit court which dismissed their complaint contesting the will of their cousin Emilie Poole Darr, who died in Portland on April 10, 1961. The contestants, Mrs. Dee Soumie and Mr. Earl Dunn, are Emilie's closest known blood relatives.

The defendants-proponents are Lois McLean, executrix of the estate and also a beneficiary thereof; The Oregon Bank, administrator cta of the estate; Mrs. Melvin Abbott, a beneficiary; Moyna Mitchell, executrix of the estate of Maude Moser Mitchell, deceased, a beneficiary; Hazel Elliott, a beneficiary; Lil-

lian Kurman, a beneficiary; and the Theosophical Society of Portland (hereinafter "the Society"), residuary legatee.

Emilie Poole Darr was born around the turn of the century in San Francisco. She became married but was later divorced and never remarried. She had no children. In the early 1940's, after the death of her father, she moved with her mother to Portland where in 1945 they purchased from one Stacsa Plinkiewisch a residence located at 3705 North Longview. Stacsa subsequently became a close friend of both Emilie and her mother. Emilie's mother died of cancer in 1953. Shortly thereafter Emilie herself became afflicted with cancer of the breasts. During the years between her discovery of the cancerous condition and her eventual demise she sought aid from practitioners of divers persuasions, at least two of whom were qualified medical doctors. In the year 1960 Lillian Kurman, who we have indicated is a beneficiary under the will being contested, came to Portland from San Francisco to act as a companion and a housekeeper to Emilie. Lillian and Emilie had been friends for many years. They lived together in Emilie's home until her death in 1961. The aforementioned Lois McLean, an active member of the Society, then became executrix of the estate.

Emilie was the author of many wills, five of which are in evidence. Three of the five were written prior to 1956 and named as executrix her friend Stacsa Plinkiewisch. There is some indication that she wrote other wills between 1956 and 1961, but none of them are in evidence.

In November of 1960 Emilie became a member of the Society. The testimony reveals that she had a high regard for it and its members. Although her

poor health precluded her attendance at the meetings, she was anxious that Lillian too should become affiliated with the group. In January of 1961 Emilie executed a will which named Lois McLean executrix and made the Society her chief beneficiary. Subsequently an attorney suggested some changes. The will was revised in accordance with his suggestions, and a new will was executed in March of 1961, also naming Mrs. McLean as executrix and leaving the residue of the estate to the Society. In substance, the January and March wills differ little. Both were signed by the same subscribing witnesses. The foregoing suffices as a brief introduction to the rather complicated circumstances which form the fact situation of this case.

The two assignments of error submitted by the contestants are the following:

"The Court erred in holding Emilie Poole Darr had testamentary capacity to execute the purported will of March 9, 1961."

"The Court erred in holding that the purported will of Emilie Poole Darr was not the product of undue influence."

In support of their first assignment of error contestants contend that Emilie was subject to monomania and that this fact renders her will invalid although she may otherwise have been of sound mind.

"Monomania" is described in Webster's New International Dictionary as:

"a. mental derangement (orig., insanity) restricted to one idea or group of ideas; * * * b. Popularly, such concentration on a single theme as to suggest mental derangement; also, its object."

Contestants claim that Emilie was subject to monomania in the following respects: (1) with regard to

medical doctors, surgery and treatments for her illness; (2) "she was easy prey for persons glibly promising a cure, such as the active proponents (Mrs. McLean and Mrs. Clehm) and their cohorts. * * *" and (3) she suffered from delusions concerning some of her close friends and relatives.

As factors indicative of monomania we are referred to Emilie's preference for a vegetarian diet, to her refusal to submit to surgery, to her apparent distrust of medical doctors and to her consultations with practitioners using unorthodox healing methods. People who are converted to branches of the healing arts other than that branch which is generally known as "medicine," are not uncommon. Nor is there a dearth of persons who hold aloof from medical doctors and who are reluctant to undergo surgery. Even if it be conceded that Emilie labored under the mistaken belief that the various practitioners she visited were improving her condition, it cannot be concluded that she was insane in this respect. The most that could be said of such a situation is that she was misinformed. In the words of the able trial judge, "There are lots of gullible people in the world." And gullibility is not to be confused with insanity. In passing, we note that among the persons whom Emilie consulted regarding her health were two medical doctors, and that her mother had been under the care of a qualified medical doctor immediately prior to the mother's death.

It is implied that members of the Society urged upon Emilie some of these practitioners, guaranteeing favorable results and subsequently causing her to believe that her health was improving. The record is devoid of evidence supporting these allegations. While it is true that Mrs. Clehm recommended to Emilie a

practitioner in British Columbia, it would be a novelty to assume that by this recommendation she was guaranteeing complete satisfaction. Nothing in the record indicates that any member of the Society gave Emilie the impression that she was getting well.

■■ Contestants also contend that Emilie was subject to monomania as regards her relationship to her relatives and close friends. Mrs. McLean, an active member of the Society and executrix of the will, testified concerning a conversation she had with Emilie about Mrs. Soumie, Emilie's cousin, as follows:

> "She said she felt Mrs. Soumie didn't need this and she didn't approve of Mrs. Soumie, anyway, and she had plenty of money, and besides, she didn't like the way that she dealt with elderly people on relief."

Mrs. Augusta Clehm, who at the time of the trial was President of the Society, testified that Mrs. Darr had complained to her that Dee Soumie was greedy despite the fact that she had a substantial amount of money, that she was a heavy drinker, was often untruthful, took advantage of elderly people through her sharp business practices and that she was jealous of Emilie. Similar testimony was given by Hazel Elliott, an intimate friend of Emilie and also a proponent of the will.

It will be recalled that Lillian Kurman, a longtime friend of Emilie, came from San Francisco to act as a housekeeper and companion to Emilie during her illness. Some of proponents' witnesses testified that Emilie had complained to them that Lillian was a poor housekeeper and that she had not fulfilled Emilie's expectations in that regard. Emilie also was critical of Lillian's rather pessimistic outlook on life. In

addition, she was quoted as having said that Lillian had at one time been committed to a mental hospital and that it was chiefly through her (Emilie's) efforts that Lillian had been released. Lillian testified that she had never been a patient in a mental hospital.

Contestants, on the other hand, produced testimony of an intimate and amiable relationship between Emilie and her cousin (Mrs. Soumie) and between Emilie and Lillian Kurman, which relationships remained intact until the time of Emilie's death. They (contestants) contend that this seemingly inconsistent behaviour is evidence of monomania. They appear to assume that Emilie's criticism of what in her opinion were undersirable characteristics in her close acquaintances cannot readily be reconciled with her intimate relationships with them. In support of their contention they rely on some Oregon cases. Typical of these is *Hofen v. United States National Bank*, 215 Or 603, 335 P2d 86 (1959) from which we quote:

> "The testimony of neighbors and acquaintances * * * would establish that prior to May or June of 1943 testatrix and contestant enjoyed the usual mother-daughter relationship of mature people. At that time testatrix was approximately 86 years of age. In May and June of 1943 she was confined in a hospital as a result of an infection in one leg. Following her discharge from the hospital, the attitude of testatrix began an abrupt change. * * *"

In the Hofen case exhibits were introduced which consisted of pictures of the contestant daughter taken in her childhood. The pictures were torn into small pieces and in each instance the face and eyes had been scratched by a sharp object. In commenting on this evidence, the court said:

> "* * * we can only accept the evidence of

the preservation of these photographs for over half a century, and the prior affectionate reference made to them, as an indication of the mother's affection for her daughter prior to the time mentioned. That she would thereafter deface the pictures in so cruel a fashion demonstrates an implacable hatred directed at the daughter. We think this unexplained objective evidence, together with the testimony of the witnesses mentioned, convincingly establishes that the mind of the testatrix was so deranged and so demented with reference to her daughter that she could not possibly act with reason or rationality in respect to her. * * *"

The Hofen case, in common with other Oregon cases in this area, regards as an essential element of testamentary incapacity, where a change in the testator's attitude towards his friends and relatives has occurred, that the change be a noticeable one, that is, that it be sufficiently "abrupt" so that a marked difference appears. No evidence of such a change in Emilie appears from the record in the case at bar. Lillian Kurman, whose testimony, despite the fact that she was named in the complaint as a proponent, decidedly sympathized with contestants' view of the case, testified as follows:

"Q Did her habits change in connection with discussing her affairs with you?
"A Well, she didn't discuss wills any longer, but no, she didn't seem to have changed much."

On cross-examination Hazel Elliott, a proponent, testified thus:

"Q Now, was there any other conflict between them?
"A Well, she always figured Dee was mercenary.

"Q Any other conflicts? This went over a long period of time, did it, Mrs. Elliott?

"A I was under the impression that it had gone on practically all their life.

*     *     *

"Q Just a minute, Mrs. Elliott. I understand your testimony to be that this criticism of the drinking and of Mrs. Soumie's habits had continued over a long period of time?

"A Yes.

"Q Over a period of years?

"A Well, ever since I have known Emilie.

"Q The habits of Mrs. Soumie were different from the habits of Mrs. Darr; is that right?

"A Yes."

The foregoing uncontradicted testimony clearly reveals that there was no radical change in the attitude of Emilie toward either Lillian Kurman or Dee Soumie, if there was any change at all. To the contrary, her disapproval of Mrs. Soumie's habits had persisted through the years despite their close friendship. It would indeed be a novelty to conclude that because Emilie criticized certain of her cousin's practices and because of those practices preferred not to entrust her estate to that cousin, that she fostered within herself a hatred for her cousin which bordered on insanity. Only in the most unusual of circumstances do even the best of friends approve all of each other's actions and attitudes.

That Emilie said little that was good about Mrs. Soumie to Mrs. Clehm and Mrs. McLean is of little consequence. The worst that could be inferred from this factor is that Emilie was a gossip. Although the compulsion to gossip is not a trait to be admired, it can hardly be deemed evidence of insanity. Here again,

it is significant that Emilie's dissemination of Mrs. Soumie's faults began long before her close acquaintance with members of the Society and before she herself became a member.

Nor do Emilie's criticisms of Lillian indicate that she (Emilie) was insane. There is nothing to show that this criticism represented any change in Emilie's general attitude toward Lillian. We have observed that Lillian herself testified that she could detect no change. It is conceivable that Emilie could frankly disapprove of Lillian's housekeeping and of her general outlook on life and still regard her as a good friend and companion. That Emilie claimed that Lillian had at some time been a patient at a mental hospital and was released primarily through Emilie's efforts, even if it were true, would certainly cast no reflection on Lillian's character or her ability. Nor does the fact that the statement was untrue indicate that Emilie intended this revelation to embarrass Lillian. The testimony would rather support the conclusion that this was an attempt by Emilie to justify in her own mind her acceptance of Lillian's gratuitous services.

■ It should be noted that the contestants introduced no evidence which tends to refute Emilie's statements that Mrs. Soumie was a heavy drinker, that she was often untruthful, that she engaged in sharp business practices at the expense of elderly people, and that she was greedy. The existence of such testimony may have aided her cause. Its absence justifies an inference that the charges were not without foundation in fact. ORS 41.360 (5).

In view of the considerations which have gone before, we must conclude that contestants have not brought evidence sufficient to establish that Emilie

Darr was subject to monomania at the time she executed the will under consideration.

■ Proponents, on the other hand, produced many witnesses, several of whom were disinterested parties and each of whom testified that Emilie was of sound and disposing mind, that she was capable of recognizing and disposing of her property and that they at no time observed any change in her mental capacity. Both persons whose signatures appear as witnesses to the will emphatically supported these observations. We conclude that the proponents have sustained their burden and that Emilie Darr had testamentary capacity at the time she executed the will. Contestants' first assigment of error is without merit.

In their second assignment of error the contestants claim that the trial judge erred in failing to find that the will of March 9 was the product of undue or improper influence. They contend that members of the Society "and their cohorts" were guilty of improper conduct which influenced Emilie to make the Society her residuary beneficiary. They point to circumstances surrounding the preparation and execution of the will which they claim raise a presumption of improper influence, which presumption it is the proponents' burden to rebut. We proceed to. a consideration of those circumstances.

Emilie's contacts with members of the Society prior to 1960 can best be described as sporadic. During the summer of that year, however, the aforementioned Mrs. Clehm began to take a special interest in her. Mrs. Clehm testified that she had been led to believe that Emilie was lonely and that she needed companionship. She swore that it was to fill this void in Emilie's life that she began making weekly visits and conversing with Emilie frequently over the tele-

phone. These contacts continued more or less regularly until Emilie died.

Although she had at infrequent intervals attended lectures sponsored by the Society over the years, Emilie did not join the group until November of 1960. During the month of December of that year her certificate of membership was presented to her at her home by a Dr. Smith, a retired dermatologist who at that time presided over the American Section of the Theosophical Society, and who happened to be visiting Portland. Also in December of 1960 Emilie donated to the Society a Chinese jardiniere. Engraved upon a brass plaque attached to the gift were the words, "Donated by Emilie Poole Darr, 1960."

Mrs. Lois McLean testified that on November 18, 1960, she received a telephone call from Emilie, asking her to visit her at her home. Mrs. McLean complied with the request. This was the first time during their rather lengthy acquaintance that Mrs. McLean had been in Emilie's home. During the visit Emilie disclosed to Mrs. McLean her plans to make some changes in her will. Emilie told her that she proposed to write the will in longhand and asked her whether she (Mrs. McLean) would consent to type it for her. This Mrs. McLean agreed to do. After an interval of approximately six weeks Emilie informed Mrs. McLean that the will was ready to be typed. The typed will was delivered by Mrs. McLean to Emilie on January 8, 1961.

According to Mrs. Clehm, Emilie told her sometime during November of 1960 that she intended to revise her will and that she contemplated leaving something to the Society. At that time she asked Mrs. Clehm to arrange for two witnesses to be present whenever the will was to be executed. Mrs. Clehm suggested, so

she swore, that Emilie ask one of her neighbors to act as a witness and that Emilie voiced a preference for strangers. She testified, in part, as follows:

"Q When did she call you to get those witnesses; do you remember?

"A It was the morning of January 12. In the meantime I had contacted my cousin and Mrs. Black and they had agreed to do that for her."

The name of Mrs. Clehm's cousin is Mrs. Hunt. Mrs. Black is a good friend. She escorted those two ladies to Emilie's home where they observed Emilie as she signed the will which had been typed by Mrs. McLean. They then signed their names as subscribing witnesses, and, after a brief visit, returned to their homes. Two days later, at Emilie's request, Mrs. McLean picked up the will and took it into her possession for safekeeping.

On March 3, 1961, Mrs. McLean again received a telephone call from Emilie concerning which she testified as follows:

"A Yes. Well, I believe it was the third of March. Emilie Darr called me at home—at the office—and seemed quite disturbed and asked me to come out and see her which I did the following day. That was Saturday on March 4th. She told me that her cousin, Dee Soumie, had misused her, mentally and emotionally; that she had threatened to get control of her care, of her property. * * * and she said, 'I want you to go to an attorney and arrange for some kind of protection against my cousin, Dee Soumie.' I asked her if she had— I said, 'I don't know of any attorney; do you have one in mind?' and she said, 'I do.' She said, 'His name is Caldwell.' She couldn't think of his first name. We looked in the telephone book and found there were two Caldwells, and she said 'This Keith Caldwell, I want you to go to him because I know of an estate that he has settled satisfactorily.' So— and she said another thing: 'When you go to Mr.

Caldwell have him look at the will to see if it is in order.'"

On March 7 following, pursuant to this request, Mrs. McLean, in the company of Mrs. Clehm, visited Mr. Keith Caldwell and presented Emilie's problem to him. Mr. Caldwell testified that he prepared a power of attorney in Mrs. McLean's favor and advised Mrs. McLean to have Emilie sign it. While the two women were in Mr. Caldwell's office, Mrs. McLean spoke to Emilie on the telephone and Mr. Caldwell did so also. Immediately following this consultation with Mr. Caldwell, which was at some length, the power of attorney was delivered to Emilie by Mrs. Clehm. When Mrs. McLean returned home from work that evening Emilie thanked her by telephone for allowing her to speak with Mr. Caldwell and suggested additional changes to be made in the will. The next day, March 8, 1961, Mrs. McLean retyped the January will, incorporating the suggestions of both Mr. Caldwell and Emilie. On the same day she took the will to Emilie's home. Concurrently she picked up the signed power of attorney which was in fact never exercised but which gave Mrs. McLean the authority to provide for Emilie's care. We have stated that the purpose of the power of attorney was to eliminate the possibility of interference from Mrs. Soumie. Mrs. McLean also picked up a list which was incorporated into the new will by reference and which stated to whom the executrix of Emilie's estate should give various items of personal property. Regarding that list Mrs. McLean testified as follows:

"Q Is that the list you said you picked up that night?

"A That is the list. She had it written out and I typed it.

"Q After you typed it, what did you do with it?

"A Well, that was the ninth, I believe. She called me at the office, I believe it was shortly before noon, and said, 'When you type the list,' she said, 'put the date of the ninth on it because,' she said, 'we've arranged to have the will executed.' She said, 'Witnesses are coming out today, so type the date of March 9th on it,' which I did. Then on the night of March 9th, in the evening, I took it out to her, and she read it very carefully and she signed it and put it in an envelope, sealed it, and I took it with me and the next day, I also picked up the will also, which she had put in an envelope and sealed, and then took those documents to your [Mr. Caldwell's] office, I believe the following day.

"Q This was a list of instructions she gave you for the disposition of her personal property?

"A Yes, sir.

"Q Pursuant to instructions in the will?
"A Yes, sir."

As was the case in the execution of the January will, Mrs. Clehm, at Emilie's request, brought Mrs. Hunt and Mrs. Black as attesting witnesses for the March will. The foregoing are substantially the facts upon which contestants rely to support their claim that members of the Society improperly influenced Emilie in the disposition of her property.

■ The burden of proving that the will was the product of improper influence is upon the contestants. *In re Reddaway's Estate,* 214 Or 410, 420, 329 P2d 886 (1958). It is true that such influence is seldom capable of direct proof and that circumstantial evidence may be admitted to show that it existed. *In re Estate of Porter,* 192 Or 483, 489, 235 P2d 894 (1951). But

"\* \* \* the effect thereof, if the will is to be set aside, must be to prove that undue influence actually was exercised, and a court cannot 'accept in lieu of substantial evidence mere suspicion, innuendo, insinuation, and speculation.'" 1 Jaureguy and Love, Oregon Probate Law and Practice 319, citing *Trombly v. McKenney,* 191 Or 90, 112, 228 P2d 417 (1951). It has, however, been held that the existence of a confidential relationship, when taken in connection with "suspicious circumstances," may justify an inference of improper influence which, in turn, will demand an explanation by the beneficiary who sustains the confidential relationship. *In re Southman's Estate,* 178 Or 462, 482, 168 P2d 572 (1946). Contestants assert that the requisite confidential relationship and suspicious circumstances were present in the case at bar and that the proponents have not sustained their burden of explaining those circumstances.

■ In assessing the weight to be given a confidential relationship in determining whether improper influence has been exerted, it is well to keep in mind that an individual who is writing a will generally does not devise his property to those in whom he has no confidence. It is to be expected that a testator will leave his estate to those in whom he trusts and who he infers will dispose of it wisely. It is also natural that when he requires assistance in the preparation of his will he may consult those very persons, that is, those in whom he has confidence. To impose upon beneficiaries who occupy such a position of trust the burden of proving an absence of improper influence would in many instances defeat the will rather than probate it. *In re Knutson's Will,* 149 Or 467, 489, 41 P2d 793 (1935). The mere fact that a beneficiary has occupied a confidential relationship to the testator does not, there-

fore, of itself allow an inference of improper influence. It serves rather to alert the court to the possibility of such influence and warns it to examine the record carefully for additional circumstances which, in combination with the fiduciary relationship may support an inference of improper influence. For purposes of our consideration of the case before us we will assume that some members of the Society stood in a confidential relationship toward the testatrix, although it is not at all clear from the record that such a relationship existed.

As circumstances supporting an inference of improper influence, contestants assert that:

    1. Members of the Society actively participated in the preparation of the will.

    2. An attorney other than the one who for some years had served Emilie was consulted by the beneficiaries in connection with the will.

    3. Secrecy dominated the execution of the will.

    4. Emilie had no independent, unprejudiced advice.

    5. The will is "drastically" different from previous wills.

If supported by the evidence, these charges may, in the absence of a satisfactory explanation, justify an inference of improper influence. We will consider them in the order in which they appear.

    ■ It is well settled that where a beneficiary sustained to a testator a confidential relationship and actively participated in the preparation of the will a presumption of improper influence arises. Such presumption may, however, be rebutted by a reasonable explanation for the beneficiary's active role. But active participation contemplates more than that the benefi-

ciary merely types the will or that he is present during its execution. *In re Estate of Meier,* 190 Or 140, 150, 224 P2d 572 (1950) ; *In re Llewellyn,* 296 Pa 78, 81, 145 A 810, 66 ALR 222 (1929). The latter case, which was discussed with approval in *In re Knutson's Will,* 149 Or 467, 491, 41 P2d 793 (1935), said:

"* * * Furthermore, even in case of confidential relation the burden of proof is placed upon the legatee only where he is instrumental in procuring the legacy. Here, Swartley did not draw the will or suggest that it be drawn or that he be made legatee. On the contrary, it was drawn by a lawyer he had never seen before and who was called at the decedent's request. In summoning the attorney and in handing the draft of the will to Llewellyn, Swartley acted merely as his messenger. The active part which gives rise to the presumption must go to the substance of the testamentary act, not to some mere formal matter. In the absence of such procurement, no burden of proof rests on the legatee * * *"

In the Llewellyn case the testator and his sole beneficiary had been close friends for many years. The beneficiary summoned the attorney who drafted the will at the testator's request. The draft of the will was delivered by the attorney to the beneficiary who, in turn, delivered it to the testator. The subscribing witnesses were called by the beneficiary, also at the testator's request. And the beneficiary was present at the execution of the will. At the time the will was executed a power of attorney was also executed in the beneficiary's favor. The bequest was for an amount approximating a million dollars. Yet the court found that the circumstances of that case did not warrant an inference of improper influence.

■ Mrs. McLean's participation in the will's prepa-

ration consisted first, of typing the will after it had been drafted and written in longhand by Emilie, and second, of retyping the will incorporating the changes which had been suggested by Mr. Caldwell and Emilie herself. Mrs. Clehm's participation was limited to procuring the subscribing witnesses at Emilie's request and of being present at the execution of the will. No other member of the Society assisted in the preparation of the will. In light of our analysis which has gone before, we must conclude that these favors to Emilie are not the kind of participation which, in combination with a confidential relationship, gives rise to a presumption of improper influence.

Out of a total of five wills bearing Emilie's signature which are in evidence, three were executed prior to 1956 under the supervision of Mr. Edwin G. Amme, a Portland attorney. The other two wills in evidence are the January and March wills which are the subject matter of our investigation. We have noted that the latter incorporated some suggestions made by Mr. Keith Caldwell. Contestants contend that the fact that Mr. Caldwell rather than Mr. Amme inspected the 1961 wills casts suspicion upon those wills and is a circumstance, in combination with others, supporting an inference of improper influence.

We have described the circumstances under which Emilie directed Mrs. McLean to consult with Mr. Caldwell regarding her will. Mr. Amme testified that he did business for Emilie for the first time around 1950 and that his last item of business for her was transacted in 1956. Contestants presented no evidence that Mr. Amme was the only attorney who had ever served Emilie or that he was the only one who served her between 1950 and 1956. In addition, it is conceivable that she may have had some legal advice

from an undisclosed attorney after 1956 and prior to 1961, when Mr. Caldwell was consulted. Nothing in the record suggests an inference of collusion between Mrs. McLean and Mr. Caldwell. There is no evidence that Mrs. McLean knew Mr. Caldwell prior to her visit at Emilie's request. Indeed, the only available testimony supports a contrary conclusion. It must be remembered that the burden of establishing improper influence is upon the contestants. On this phase of their case they have shown no more than that prior to 1956 Mr. Amme attended to at least a part of Emilie's legal business and that in 1961 Mr. Caldwell made some suggestions which she incorporated into her will. It is not uncommon for people to change lawyers for no apparent reason. That Emilie should through her friends seek the advice of an attorney other than Mr. Amme five years after the latter last served her cannot be deemed a circumstance indicative of improper influence.

Contestants claim that an aura of secrecy surrounded the execution of the will. We have described the circumstances under which Emilie requested that Mrs. Clehm furnish witnesses, and have seen that Mrs. Clehm suggested that Emilie ask one of her neighbors to render the requested service. Emilie, however, did not wish to involve her neighbors in the will's execution. Under those circumstances it was to be expected that Mrs. Clehm would procure the services of persons whom she considered trustworthy. That she had to drive a short distance out of her way to get them is of little consequence. Contestants attach great significance to the fact that only Mrs. Clehm and the two witnesses she had supplied were present in the room when Emilie signed the will. The law does not demand that a testator have present at the signing of his will

a gallery of spectators. It requires two witnesses. Two persons testified that they saw Emilie sign her will and that they signed as subscribing witnesses. There is no evidence that Lillian, the housekeeper, was excluded from the room at the request of members of the Society or those sympathetic toward it. Nor does it appear that Emilie herself asked Lillian to leave. Lillian herself, as a witness for the contestants, testified as follows:

"Q  Was the will signed?

"A  That was on March 9th, and they had— Mrs. Clehm had her aunt and her aunt's good friend there to sign it.

"Q  Those three ladies. Where were you at that time?

"A  Well, Emilie said to me, 'You know, I am going to sign this will,' and I said, 'Oh, that's all right, I'll get out.'

"Q  Did you leave the room?

"A  Yes, I did, I went out - - - -"

At another point in the trial Lillian testified:

"Q  Were you ever sent out of the house when business affairs were supposedly being discussed?

"A  She didn't have to; I would disappear myself."

It is clear from her testimony that Lillian left the room voluntarily. It is also clear that before she left the room Emilie had informed her that she was about to sign the will. She did not keep this fact secret from Lillian. Even if Lillian had been asked to leave the room while the will was being executed, our view would be unchanged. See *In re Knutson's Will,* 149 Or 467, 495, 41 P2d 793 (1935).

When asked upon cross-examination what knowledge she had of the wills, Mrs. Soumie a contestant, testified:

"A * * * when she started in about wills, I'd say, 'I don't want to know anything about them.' I don't believe in that.

\* \* \*

"Q She didn't tell you in that will she had failed to mention you at all.
"A No, she never did. We never talked—I'd say, 'Don't talk about it.'

\* \* \*

"Q I hand you Proponents' Exhibit No. 2, being a will dated the 12th day of January, 1961, and ask you if she talked to you about that will and any of its provisions?
"A Let's see, what is the date?

"Q It is on the other page, Mrs. Soumie—12th day of January, 1961.
"A Oh, she talked to me about a will at that time but she was so sick that I said, 'Don't tell me about it; you don't need it; you are going to get well.'

\* \* \*

"Q * * * I will hand you * * * a will dated March 9, 1961, and ask you if she talked to you about that will * * *.

\* \* \*

"A Well, she said, 'I am going to give you the silver teaspoons.' * * *

"Q You knew you were a beneficiary under this last will, didn't you?
"A Well, that's what she—that's all she discussed in it, was the silver teaspoons."

Two significant facts appear from the foregoing testimony. First, Mrs. Soumie was informed by Emilie

herself that she had executed a will in the early part of March. She did not keep this fact from Mrs. Soumie. Second, Mrs. Soumie conceded that she herself repelled each attempt Emilie made to discuss with her her wills. In light of that concession it is difficult to understand how Mrs. Soumie can now in good faith complain of the alleged secrecy surrounding the execution of the wills. That Emilie preferred not to divulge to all the world the terms of her will is natural. But that she kept the fact that the will had been executed from her closest friends is not supported by the record. Nothing in the law requires a testator to publish the contents of his will from the housetops. Only where he wishes to do so and is restrained therefrom by the beneficiary can any inference of improper influence be drawn. The record reveals no trace of such a desire or support for such an inference. The allegation of secrecy is unfounded.

■ It is also contended that it was incumbent upon the proponents to come forward with evidence that Emilie received independent advice about her will. We repeat that the burden of proving improper influence is upon the contestants. Theirs is the burden of bringing evidence showing that no independent advice was received, or, in the alternative, that the circumstances precluded the receiving of such advice. No such showing has been made. To the contrary, the record clearly shows that members of the Society visited Emilie infrequently. She had ample opportunity to obtain independent advice either from Lillian Kurman or from the substantial number of visitors she received.

When questioned whether she had ever advised Emilie to obtain independent advice Mrs. Clehm swore that at one time she suggested to Emilie that she consult an attorney and that Emilie had declined to do

so. We are not prepared to thrust upon a beneficiary the burden of coercing the testator into obtaining advice from independent sources. It is sufficient that the suggestion be made that such advice be sought and that the beneficiary refrain from conduct which would hinder obtaining such advice. We note that Emilie did in fact receive advice regarding her will from Mr. Caldwell. Although his advice was not given under ideal conditions, nothing indicates that it was prejudiced.

■ We have shown that it was suggested that Emilie obtain advice from an attorney, that she in fact did receive advice from an attorney and that she had ample opportunity to receive independent advice from a variety of sources. In view of these circumstances we find no support for the contestants' contention that Emilie had no independent advice.

Contestants complain that the will is "drastically" different from previous wills. It has been shown that three of the wills executed by Emilie prior to 1961 were offered in evidence. It is significant that in none of these did Emilie leave a bequest to either of the individuals contesting the present will. Each of those wills contains this provision: "The failure to mention any relatives herein has been intentional." The wills which were prepared in 1961, however, and which contestants claim were the products of improper influence each leave something to each of the contestants. This change favored the contestants.

The most significant change between the wills executed prior to 1956 and those executed in 1961 is that in the former Stacsa Plinkiewisch was named as residuary legatee whereas in the latter the Society inherited the residue. It will be recalled that Mrs. Plinkiewisch is the individual from whom Emilie and

her mother purchased a home soon after their arrival in Portland. Mrs. Plinkiewisch testified that prior to 1955 there had been a rather close relationship between Emilie and herself but that they gradually saw less and less of each other. The last time she saw Emilie was in 1958. It is not unnatural under such circumstances that Emilie should wish to leave the residue of her estate to someone or some organization with which she had been more closely associated in the recent years of her life. We do not deem a change of this nature sufficiently drastic to arouse suspicions.

■ Some testimony was introduced which indicates that between 1956 and 1961 Emilie made several wills in addition to those which are in evidence. Contestants claim that the existence of those wills makes comparison of the March 1961 will with the older wills invalid. They speculate that the intervening wills may have contained terms substantially different and more favorable to their cause. In such speculations we are unable to indulge. Contestants have charged that the March will is drastically different from previous wills. No previous will in evidence remotely supports that contention. Theirs was the burden to submit evidence supporting their charge. They have not done so. We therefore have no choice but to conclude that the contention is without merit.

Also submitted as evidence of improper influence is the alleged change in Emilie's attitude toward her close friends and relatives. In our discussion under the first assignment of error we showed that neither the testimony of the witnesses nor the wills in evidence support a conclusion that any significant change occurred. This charge must be dismissed as unfounded.

In addition to the contentions we have discussed, contestants present an argument which apparently was

not presented to the trial court and with which the witnesses were not confronted. They claim that the fact that a jade ring which in the January will had been left to Mrs. Soumie was omitted from the March will entirely and subsequently appeared in the bequest of personal property to Mrs. Clehm is a circumstance supporting an inference of improper influence. We derive from contestants' briefs and from counsel's oral argument the impression that they have erroneously assumed that the words "jade ring" were typed into the list of bequests to Mrs. Clehm by interlineation after the rest of the personal property list had been completed. A careful inspection of that list has convinced us that this is not the case and that the words "jade ring" were on the list which Mrs. McLean copied from the handwritten list which Emilie had prepared. Its deletion from the body of the will is understandable in light of Mr. Caldwell's advice that all items of personal property should be included in a separate list rather than in the will itself.

◼ In disposing of the specific contentions which contestants have raised, we have assumed that there existed between Emilie and members of the Society a confidential relationship. We are aware that there existed for the members of the Society opportunities to exercise improper influence. But this Court has consistently held that the bare opportunity will not support an inference of improper behaviour. We have read the record and the exhibits with care and are satisfied that the evidence does not warrant a finding of improper influence. The contestants' second assignment of error is without merit.

The decree of the circuit court is affirmed.