88 Ariz. 312 (1960)
356 P.2d 408
In the Matter of the ESTATE of Julie H. PITT, Deceased.
Guy ANDERSON, Appellant,
v.
A.C. KALKBRENNER, Appellee.
No. 6556.
Supreme Court of Arizona.
November 2, 1960.
Rehearing Denied November 29, 1960.
*313 Jennings, Strouss, Salmon & Trask, Phoenix, for appellant.
Moore & Romley, Phoenix, for appellee.
Marvin Johnson, Phoenix, amicus curiae.
LESHER, Justice.
This is a will contest. The appeal is from an order of the court below denying admission to probate of the will of Julie H. Pitt. The court's order was based upon a jury verdict finding specially that the will had been executed as a result of undue influence exercised over Mrs. Pitt by appellant, the proponent of the will and the principal beneficiary thereunder. The contestant, appellee here, is a nephew of the testatrix.
Appellant assigns as error the insufficiency of the evidence to support the verdict. The trial was lengthy, the evidence largely unconflicting. The parties agree that if in this haystack of testimony  four thick volumes of transcript  we can find even one needle of competent evidence reasonably tending to support the result below, the verdict and judgment must stand.
Julie H. Pitt departed this life on September 29, 1956, a resident of Maricopa County. Until 1940, she and her husband *314 lived in Clifton, Arizona, where she owned and operated a hotel. In that year they moved to Phoenix, where in 1945 Mr. Pitt died.
Guy Anderson was born in Graham County and his parents knew the Pitts in Clifton before his birth. His first memory of Mrs. Pitt was seeing her in his parents' home when he was a small boy of five or six years when Mr. and Mrs. Pitt visited in their home. Mrs. Pitt frequently came to Guy's office to visit him in later years. She had told other persons such as Matt Dannenhauer, of Clifton, former County Treasurer, State Legislator, Justice of the Peace and present Clerk of the Board of Supervisors, who was a close friend, that she felt responsible for Guy's success and looked upon him as a son. She also told Matt Dannenhauer that when she passed away she hoped there would be enough money of hers left to pay Guy for all he had done for her. This was prior to the execution of either will. Other witnesses from Clifton and Safford told of the high regard with which Mrs. Pitt always spoke of Guy Anderson. Mrs. Thompson, her next door neighbor in Phoenix for twelve years, likewise testified she spoke of Mr. Anderson "with highest regard". She loaned money to Mr. Anderson which he repaid. In later years she spent some Christmases in the Anderson home; she exchanged Christmas gifts with the Anderson family. One of the Anderson daughters was invited to spend a week with Mrs. Pitt in Phoenix and Guy assisted Mr. and Mrs. Pitt in completing the sale of the hotel in Clifton. When Mr. Pitt became ill in Safford in 1939, he called for Guy Anderson and Mr. Anderson went to him and likewise when Mrs. Pitt became ill in Clifton she sent for him. When Mr. Pitt passed away in Phoenix early in 1945, Mrs. Pitt held up the funeral a couple of days so that Mr. Anderson could attend. During Mr. Pitt's lifetime and while the Pitts lived in Phoenix, the Andersons would visit them two or three times a year which was likewise before either will was executed.
There were three wills executed by Mrs. Pitt, so far as the evidence discloses. In the nineteen-thirties Mrs. Pitt and her husband Willard A. Pitt executed similar wills in favor of each other. There were no bequests to any relatives. Mr. Pitt died in February, 1945, and Mrs. Pitt asked Guy Anderson to handle the probate of his estate. It was an estate of approximately $2,700. On one of Anderson's rather frequent visits to Phoenix and to Mrs. Pitt, she wanted to go to Safford and thence to Clifton to visit her good friend Teresa Spezia. Mr. Anderson took her in his car with him to Safford on May 11, 1945. She told him she wanted to make a will and on May 12 appeared at his office with Mrs. Spezia. While Mrs. Spezia remained outside, Mrs. Pitt went into Anderson's office and told him she wanted to make a will. *315 He asked her what bequests she wanted to make and she listed a bequest of $3,000 and the house to Kenneth Pitt, a nephew of her husband who was then living in her home; $2,000 each to Mr. and Mrs. Kalkbrenner; Teresa Spezia, $1,000 and a brooch; and $1,000 to Mrs. James Kerby. Mr. Anderson then asked her what she wanted to do with the rest of her property and she said "I want to give it to you." Anderson was startled and surprised and said as much. After some discussion of the bequests, she left. Charles Smith, who had been with Guy Anderson as an associate, was in a small office connecting that in which the conversation took place and the door was open or partially open between the offices. He heard the conversation or most of it and suggested to Mr. Anderson that he, Mr. Smith, should prepare the will since Anderson was a principal beneficiary. This was done by Smith from Anderson's notes and in the afternoon it was signed in front of three witnesses. One of the three witnesses to this will was Tom Maddock, also a witness to the 1947 will. He testified that Anderson asked Mrs. Pitt why she had made the will with him as a principal beneficiary and she explained that she had no one else that she wished to remember other than those mentioned and that Mr. Anderson had been her husband's friend.
Later, Mrs. Pitt quarrelled with Kenneth Pitt, her husband's nephew, and asked him to leave. Thereafter, she repeatedly asked Anderson to rewrite the will leaving Kenneth out. The will was finally rewritten by Mr. Smith exactly as the first but with the bequest to Kenneth omitted. This is the will that is in question in this litigation. Mrs. Pitt was living on Portland Street and Anderson brought the will to Phoenix with him. On the day before it was executed he had Mrs. Pitt read it and told her if it was not what she wanted she was free to change any part of it including the bequest to him. She said that was the way she wanted it. The following day, February 16, 1947, Anderson saw Mike Bennett and Tom Maddock in the lobby of the Adams Hotel and took them out to Mrs. Pitt's home to act as witnesses to the execution of the will. Both witnesses testified at some length concerning the formalities of the execution. Bennett said that after some polite conversation Mrs. Pitt took the lead and asked Anderson to produce the will, which he did. That Mrs. Pitt read it and Anderson asked her: "Mrs. Pitt, are you sure this is what you want to do?" and she said "Yes". The will was then executed in counterparts and the witnesses and Anderson left. The will was placed in Mrs. Pitt's safety deposit box where it was shown in the inventory made at the time of the guardianship in September of 1949.
There are two other witnesses called by the defendant who should be mentioned. Blaine Shimmel, Phoenix attorney, testified he had known Mr. and Mrs. Pitt from *316 the days when he practiced law in Clifton and that after he came to Phoenix and approximately ten or twelve years ago he handled two legal matters for them. Although he did not remember the details, he did remember that it was Mrs. Pitt who conducted the business.
Mrs. Janet Graham testified that she is an assistant cashier of the Valley National Bank in charge of the savings department. She became acquainted with Mrs. Pitt in 1945 when Mrs. Pitt would bring coupons clipped from securities in her safety deposit box to Mrs. Graham to be cashed. She described Mrs. Pitt as a very demanding and self-willed woman. Mrs. Graham further testified that as an officer of the bank she was supposed to be "pretty much new business minded" and to try and interest customers in making wills and trusts and bringing them to the bank. She testified that some time between 1946 and July, 1948, she talked to Mrs. Pitt about making a will. Mrs. Pitt heard her out and then informed her that she had her own attorney and counselor and that she would take the situation up with him. She further testified that Mrs. Pitt was always very positive and was on this occasion.
Appellee in his brief fairly summarizes considerable testimony concerning Mrs. Pitt's character and personality as follows:
"By nature Mrs. Pitt was not a generous person. She was very conservative and frugal and very close with her money; she knew she had money and was watching it all the time; she wasn't the type to squander her money or throw it away needlessly; and she was very close-mouthed."
Mrs. Pitt's physician from 1945 until her death testified that her mental condition was good until shortly before her death in 1956; and that she was a very strong willed individual who made up her own mind. Harold Divelbess, a Phoenix attorney, talked to Mrs. Pitt in Anderson's presence in 1953 and was informed by her that she wanted Anderson to be beneficiary under her will.
A.C. Kalkbrenner, the contestant, was a son of Mrs. Pitt's older brother. He had seen her on one occasion in 1904 and on another in 1922. He did not thereafter see her for thirty-one years, and did not correspond with her between 1940 and 1953. He moved his family to Phoenix in 1953. At that time, Mrs. Pitt was in the hospital, where he visited her frequently. About a month after she returned to her home, and apparently as a result of certain friction between Kalkbrenner and Mrs. Pitt's housekeeper, Mrs. Pitt requested that he not come back to her home. He did not do so until her death in 1956.
Anderson denied having influenced or having attempted to influence Mrs. Pitt in the making of her will.
*317 Three salient facts emerge from the morass of testimony at the trial. One, that Anderson occupied a confidential relationship to Mrs. Pitt at the times the 1945 and 1947 wills were executed. Two, that he was active in the preparation of the wills. Three, that he was the principal beneficiary. We have minutely examined four volumes and 1,275 pages of transcript in this case, with special attention to those excerpts selected by appellee as best supporting the jury's verdict. We are satisfied that there is in this entire record no evidence whatever of any facts showing undue influence, or from which a fair inference of undue influence could be drawn. Evidence is wholly lacking to show that Mrs. Pitt was open to undue influence from anyone. In fact, the record abounds with testimony from which the only reasonable conclusion is that she was not.
We thus arrive at this point: unless the three enumerated facts are in and of themselves sufficient basis for the jury's verdict, in the face of Anderson's denial that he influenced or attempted to influence Mrs. Pitt, the verdict cannot stand.
In re O'Connor's Estate, 74 Ariz. 248, 246 P.2d 1063, 1071, involved a will contest not unlike this one. There, one Harry W. Kelsey (1) occupied a fiduciary relationship to the decedent, (2) was active in procuring her will to be drawn and in its preparation, and (3) was the sole beneficiary. In that case this Court said:
"We now proceed to the second question. Did Kelsey exercise such influence over deceased in the making of her will that it had the effect of overpowering the will of the testatrix and substituting his will for hers? As we stated above we are convinced that there existed a fiduciary relation between Kelsey and deceased from 1933 until the date of her death in 1947. Kelsey was active in the preparation of the will in that he conveyed to Mr. Barry, the attorney who drew the will, the information concerning what it should contain and particularly that he was to be the sole beneficiary. These two items when coupled together raise the legal presumption of undue influence. In re Hesse's Estate, 62 Ariz. 273, 157 P.2d 347. However this legal presumption was dissolved when Kelsey testified that he had not exercised any influence over the deceased concerning the disposition of her property. This is true even if neither the judge nor the jury believed the denial to be true. Silva v. Traver, 63 Ariz. 364, 162 P.2d 615.
"It would seem to follow that under our decisions when the presumption of undue influence has been dissolved, the burden then devolves upon the contestants to prove the existence of undue influence by a clear preponderance of the evidence. An examination *318 of the authorities indicates the majority rule to be that when the presumption of undue influence once arises that the burden of proof then shifts to the proponents of the will to prove by the clear weight of evidence a lack of undue influence in its execution. We have held otherwise. We think this court made a sound and logical distinction between a legal presumption and an inference in Seiler v. Whiting, 52 Ariz. 542, 84 P.2d 452, and in pointing out that a legal presumption is not evidence; that the presumption completely vanishes upon the introduction of any evidence to the contrary. This rule has been enunciated by us in a number of cases. However, it is not necessary to apply it in this case for the reason that the absence of undue influence is established by clear and convincing evidence. The fact that Kelsey had the opportunity to exercise such influence over deceased is not sufficient to establish undue influence and to invalidate a will. In re Hull's Estate, 63 Cal. App.2d 135, 146 P.2d 242. As above stated there is no evidence tending to show that the will of deceased was overpowered and the will of Kelsey substituted in lieu thereof in the execution of the testamentary instrument disposing of the property of deceased. * * *
"The testimony is to the effect that deceased was a woman of strong mind and not easily influenced. The law favors testamentary disposition of property."
We believe the quoted language to be peculiarly applicable to the case before us. Appellee urges the rule that where the three facts referred to above are found to exist, the burden of proving that there was no undue influence is on the proponent of the will. He cites cases from California and other jurisdictions. That rule is not the rule of this state, nor are those cases compelling here. The appellee's contention has been examined and rejected by this Court before. In re O'Connor's Estate, supra. Appellee suggests that we should here modify or depart from our ruling in that case. This we decline to do, believing the reasoning expressed in that opinion and the earlier cases cited therein to be sound.
Upon Anderson's denial that he influenced or attempted to influence Mrs. Pitt in the disposition of her property, any presumption of undue influence disappeared. It was thereafter incumbent upon the contestant to prove it by clear and convincing evidence. The record is barren of such evidence. The verdict of the jury is supported by nothing beyond speculation, suspicion and bottomless inference.
The judgment of the lower court is reversed, and the case remanded with instructions to admit the will to probate.
*319 STRUCKMEYER, C.J., and PHELPS, BERNSTEIN, and UDALL, JJ., concurring.