428 P.2d 662

In the Matter of the ESTATE of Mary Helen HARBER, Deceased.

Marguerite E. BENNETT et al., Appellants,

v.

Irene FOLEY, Individually, as Executrix of the Estate of Mary Helen Harber, Deceased, and as Guardian Ad Litem of Charles J. Stevens, a Minor, Mary Helen Clancy, Truly Golay, and Order of Rainbow Girls, Marie Harber Assembly, Appellees.

No. 8414.

Supreme Court of Arizona,
In Banc.

June 7, 1967.

Rehearing Denied July 6, 1967.

George D. Locke, Moore, Romley, Kaplan, Robbins & Green, Phoenix, for appellants.

Lewis, Roca, Scoville, Beauchamp & Linton, by Charles Crehore, John J. Flynn, Don A. Davis, Phoenix, for appellees.

LOCKWOOD, Justice:

This is an appeal from a judgment on a directed verdict in favor of the proponents of the will of Mary Helen Harber. The contestants, sisters and nieces and nephews of the testatrix, filed their amended petition to revoke the probate of Mrs. Harber's will on November 12, 1963. The contestants sought the revocation of probate on the grounds that: (1) the testatrix lacked testamentary capacity; (2) the will was not duly executed according to law; (3) the will was a product of undue influence exerted on the testatrix by the proponents of the will; and (4) the will was a result of fraudulent representations by the proponents to the testatrix. The proponents of the will were Irene Harber Foley (testatrix' niece by marriage who had been raised from childhood by Mrs. Harber and her husband), Mrs. Foley's children, and the Order of Rainbow Girls (Marie Harber Assembly). Following the presentation of the contestants' case the

trial judge directed a verdict in favor of the proponents.

Mary Helen Harber (nee Hunter) was born September 15, 1884 in West Virginia. She had four older brothers: William, Clayton, John and Henry; and two younger sisters: Marguerite Hunter Bennett and Rubie Hunter Baker. When Mary Harber died she was survived by her two sisters and her brother, John. John died four months before the trial of the cause. The two sisters and the sons and daughters of Mary Harber's brothers are seeking to revoke the probate of her will.

After spending the first twenty years of her life in West Virginia, Mrs. Harber moved to Oklahoma to live with an aunt. While there she met and married Dr. J. N. Harber on July 4, 1906. Their marriage lasted for fifty-six years, terminating upon the death of Dr. Harber on August 8, 1962. In 1938 the Harbers moved from Oklahoma to Arizona. Upon moving to Phoenix, the Harbers purchased a forty acre parcel of land on the southeast corner of North Central Avenue and East Bethany Home Road. The purchase price of the property was $43,000. In 1960 or 1961 Mrs. Harber was offered $1,500,000 for the property. In June, 1938 Dr. and Mrs. Harber entered into an agreement by which Mrs. Harber would receive title to the forty acres as her separate property and $100,000 cash in exchange for relinquishing all claims to any community property held, or to be acquired by the parties. The agreement states as its purpose to allow each of the parties to dispose of his property for the benefit of his brothers, sisters, and other blood relatives. Throughout the rest of their lives the Harbers resided at the home on this forty acre parcel.

The Harbers were childless. However, they did raise from an early age Dr. Harber's twin nieces, Irene and Marie Harber. Marie Harber died at a very young age. Irene Harber is now married to Harry Foley and will be referred to as Irene Foley. Irene Foley and her three children of a previous marriage are the principal

beneficiaries under the will which is the subject of this contest. There was no attempt by the Harbers to adopt Irene until the summer of 1962. The petition for adoption of Irene Foley was dated July 18, 1962. However, the papers were not filed in the superior court until August 7, 1962. The following day Dr. Harber died and the proceedings were terminated. In the petition for adoption, Dr. and Mrs. Harber stated that they: were childless; had raised Irene Foley; had treated her as a daughter; now wished to confer upon her the right to inherit their property as if she were their natural born child.

In 1941 Mrs. Harber executed a will leaving $65,000 in specific bequests to members of her family. Irene was not mentioned at all in this will. There was no residuary clause so that under the law of intestate succession the balance of Mrs. Harber's property would have gone to her husband if he survived her.

In the early part of September, 1962 Mrs. Harber executed a will which was physically prepared by Harry Foley (to be referred to as the first will). The whereabouts of that document is unknown.

On September 13, 1962 Mrs. Harber executed a will (to be referred to as the second will) and an addendum to that will at the Southwest Savings and Loan Association. The will was physically prepared by Iener W. Nielsen, an attorney, licensed in California but not in Arizona. Mr. Nielsen was Harry Foley's attorney. It was prepared by Mr. Nielsen in California and sent to Harry Foley. Harry Foley and Irene Foley then accompanied Mrs. Harber to the Southwest Savings and Loan Association for the purpose of having the instrument executed.

This will provided for a bequest of $150,000 to Irene Foley to be held in trust for the following purposes: (1) the payment of $250 per month to each of the testatrix' sisters and to her sole surviving brother for the duration of their lives; (2) in the event of sickness, the trustee (Irene Foley) in her sole discretion was to

determine the amount necessary in addition to the $250 per month for the care of the beneficiaries; (3) upon the death of one of the beneficiaries the monthly income should be applied to the other life beneficiaries; (4) upon the death of the surviving life beneficiary the corpus of the trust should be divided equally between Irene Foley and her issue. It also provided for eleven specific bequests to various nieces and nephews totaling $23,500 which would be distributed if they survived the testatrix. The balance of the estate was to be divided one-half to Irene Foley and one-half to Mrs. Foley's issue.

On October 22, 1962 Mrs. Harber executed another will (to be referred to as the third will). This is the one which was probated and is being contested in the present action. This will was drafted by Mr. Nielsen in California and forwarded to Harry Foley. It was then executed by Mrs. Harber at the offices of the Southwest Savings and Loan Association. Mrs. Harber was accompanied to the association by Irene and Harry Foley. The will was witnessed by Rex E. Staley, the President of the association and Patricia Andrews.

This third will was very similar to the second. However, in addition to the trust established for the benefit of her sisters and brother, Mrs. Harber gave her sister, Mrs. Baker, a life interest in the home at 346 West Vernon, Phoenix, Arizona in which she was living. This will also provided for special bequests to four more nieces and nephews in addition to the eleven nieces and nephews mentioned in the second will totaling $8,000. All the specific bequests, however, were made conditional upon the recipients surviving the distribution of Mrs. Harber's estate. Funeral expenses for the testatrix' two sisters were to be paid for with moneys from the trust or from the balance of the estate. A $5,000 bequest to the Order of Rainbow Girls, the Marie Harber Assembly was also made.

The contestants, at the close of their case withdrew their contentions that the testatrix lacked testamentary capacity and that

the will was not properly executed. Therefore the questions presented to us are whether it was proper for the trial judge to direct the verdict for the proponents on the issues of undue influence and fraud. We shall consider the former first.

■ Appellants contend the issue of undue influence is raised by a presumption citing In re O'Connor's Estate, 74 Ariz. 248, 246 P.2d 1063 (1952). In that case this Court stated that the presumption of undue influence is created by the showing that: (1) there existed a "fiduciary" relationship between the testatrix and the principal beneficiary under the will, and (2) the fiduciary was active in the preparation or procurement of the will. In later cases the Court stated that the relationship involved in creating the presumption was "confidential." See In re Estate of Pitt, 88 Ariz. 312, 356 P.2d 408 (1960); In re Estate of McCauley, 101 Ariz. 8, 415 P.2d 431 (1966). "Some confidential relationships in conjunction with other basic facts, such as proponent's activity in procuring the execution of the will and his being named as its principal beneficiary, give rise to a presumption of undue influence." In re Estate of McCauley, 101 Ariz. 8, 11, 415 P.2d 431, 434 (1966). We make no distinction between confidential and fiduciary relationships since in this context courts have used the terms synonymously. See Anno. 154 A.L.R. 583.

■ The facts of the case at bar show the existence of a warm relationship between Mrs. Harber and Irene Foley, evidenced by the fact of the adoption attempt and the fact that Mrs. Harber raised Irene as if she were her daughter. In her answers to the contestants' Request for Admissions of Fact, Irene Foley stated that there existed a relationship of "trust and confidence" between herself and Mrs. Harber. It is unnecessary for us to decide whether this is one of the confidential relationships that does not give rise to the presumption of undue influence since it is admitted that Irene's husband also maintained a confidential relationship with Mrs.

Harber. If his actions raised the presumption of undue influence then these could be attributed to his wife since she is, along with her children, the principal beneficiary under the will. In re Trefren's Estate, 86 Cal. App.2d 139, 194 P.2d 574 (1948).

■ The presumption of undue influence will not arise unless all the conditions necessary for its creation have been demonstrated by competent evidence. As one of these conditions it is necessary for the contestant to show that the beneficiary under the will was active in the preparation or procurement of the will. In re O'Connor's Estate, supra. In the present case it was admitted that Harry Foley had drawn the testatrix' "first" will. There is nothing to show that he did not just copy down the testatrix' wishes. In any case this will was not offered for probate. It was also admitted that the scrivener of the "second" and "third" wills was Harry Foley's California attorney. Following the drafting of the documents, Nielsen sent them to Foley. Then Foley and his wife accompanied the testatrix to the office of the Southwest Savings and Loan Association to have the instruments executed. After the execution of the "third" will, the document was kept in Foley's safe deposit box. It is our opinion that the evidence taken in the light most favorable to the party against whom the verdict was directed does not show sufficient activity, on the part of Harry Foley, in the preparation or procurement of the will, in order to give rise to the presumption of undue influence.

■■ The proponent's motion for a directed verdict admits the truth of whatever evidence the contestant has set forth and all reasonable inferences that may be drawn from that evidence. Davis v. Weber Drilling Co., 93 Ariz. 312, 380 P.2d 608 (1963). The contestants place great weight on the fact that the Foleys admitted that the testatrix had not, as of September 13, 1962 (the date of the second will's execution), "met" Nielson, the scrivener of the will. The fact that Mrs. Harber had not met Nielsen does not imply that she never

communicated her wishes to him independent of Harry Foley. Nothing in the record discloses that Mrs. Harber had not met Nielsen before the drafting and execution of the "third" will, the one that was probated. There is nothing in the record showing who had employed Nielsen and who paid him. It would be mere speculation to conclude that Foley did both of these things. It was shown that Mrs. Harber did not have a safe deposit box, so it was therefore quite natural for her to allow the Foleys to keep the will in their safe deposit box.

The cases that have been cited to us as authority for the proposition that the presumption of undue influence will be raised if the principal beneficiary is in a confidential relationship with the testator and has been active in the preparation or procurement of the will are of no assistance to us. In each of these cases there is considerably more activity on the part of the beneficiary in having a will executed than has been shown by the contestants in the case at bar. In In re Westfall's Estate, 74 Ariz. 181, 245 P.2d 951 (1952) the nurse, who was living with the testatrix, employed the attorney who drafted the will from information which had been provided to him by the nurse. In re Trefren's Estate, supra, reveals a situation in which the wife of the principal beneficiary had the will drafted by her own uncle to whom she related what should be placed in the will. In In re Nutt's Estate, 181 Cal. 522, 185 P. 393 (1919) the beneficiary, the husband of the owner of the institution in which the testatrix was resident, procured the attorney for the drafting of the will and submitted to that attorney the contents of the will. The presumption was raised where the beneficiary under the will was the attorney who was originally contacted by the testatrix, a friend of longstanding, and then had his law partner draw the instrument using the notes which he had prepared during his conference with the testatrix. In re Estate of Pitt, supra. In In re Day's Estate, 198 Or. 518, 257 P.2d

609 (1953) the presumption was raised when it was shown that the attorney who drew the will followed the directions given to him by the beneficiary himself.

■ In the present case there is nothing in evidence to show that Nielsen received instructions from Harry Foley as to the contents of the will which he drafted for Mrs. Harber. It would be unreasonable to allow the presumption to be raised by the mere showing that the principal beneficiary or someone whose actions could be imputed to the principal beneficiary, had suggested to the testatrix that she use a particular attorney to draw her will. If a person is in a confidential relationship with another, similar to the one in the present situation, it would be reasonable for him to recommend the use of the attorney in which he has at one time or another reposed his own confidence. The record fails to disclose whether Mrs. Harber had an established relationship of consultation with local counsel in business or legal matters. The only occasion mentioned in the record in which Mrs. Harber employed local counsel was in the matter of Dr. and Mrs. Harber's abortive attempt to adopt Irene Foley as their daughter. The record shows that the petition for the adoption and the consent to the adoption were executed on July 18, 1962. They were, however, not filed in the Superior Court until August 7, 1962, one day prior to the death of Dr. Harber. We do not express an opinion on whether the Foley's could have adopted Irene (not a minor). Nevertheless the adoption petition is evidence of the fact that Mrs. Harber desired Irene to inherit her property just as if she were her natural born child. Mrs. Harber may have been dissatisfied by the fact that the attorney who drafted the petition for adoption delayed in having it filed in the court. For that reason she may have asked Harry Foley to recommend an attorney for her so that she could execute her will.

The appellant cites Clark v. Powell, 351 Mo. 1121, 175 S.W.2d 842 (1943) to bolster his position on the raising of the presump-

tion. However, this case is also of no assistance. In that case the court found that the confidential relationship existing between the beneficiary and the testatrix was all-encompassing. The beneficiary under the will was consulted on all of the testatrix' financial ventures, introduced the testatrix to his attorney, and was the administrator of her daughter's estate. The Court ruled in that case that it was inconceivable that the testatrix had not conferred with the beneficiary regarding the distribution of her estate, and that therefore the presumption of undue influence arose. In the case at bar it was admitted that there was a confidential relationship between Harry Foley and testatrix. However, the term "confidential relationship" is quite broad. There is no evidence that the testatrix ever relied on Harry Foley for advice in business or financial matters. The only type of activity by Harry Foley in the procurement or preparation of the will in question appears to be of an incidental nature similar to the type of activity not found to be sufficient to raise the presumption of undue influence in In re Estate of Fritschi, 60 Cal.2d 367, 33 Cal.Rptr. 264, 384 P.2d 656 (1963).[1]

 The burden of proving undue influence sufficient to invalidate a will is on the contestants. We have held that when the presumption of undue influence is raised the burden of going forward with rebutting evidence is shifted to the proponents. In re O'Connor's Estate, supra. However, the evidence fails to show the required quantum of Harry Foley's activity in the procurement and preparation of the will, which is involved in the present contest, and we hold that the presumption of undue influence did not arise and therefore the burden of going forward with evidence was not shifted to the proponents.

The appellants claim that even if there was not enough evidence upon which the presumption of undue influence could have been raised it still was improper for the trial judge to have directed a verdict in favor of the proponents at the end of the contestants' case. They argue that there was sufficient evidence submitted from which a jury could have inferred that the Foleys had exerted undue influence upon the testatrix.

The appellants introduced evidence of the state of Mrs. Harber's health at the time of the execution of the will in question. Presumably this evidence was intended to show that the testatrix was susceptible to undue pressure. When she died, Mrs. Harber was seventy-eight years old. Her husband of a marriage which endured fifty-six years had died two months before the execution of the "third" will. The day following the execution, Mrs. Harber entered the hospital suffering from shortness of breath, anemia, and lack of appetite. The record of this hospitalization shows that Mrs. Harber entered the hospital for tests. She was concerned about recent weight losses and lack of appetite. The record discloses that Mrs. Harber had been hospitalized in August, 1961 for a heart attack. The doctor, in examining Mrs. Harber, stated that her condition "has very gradually deteriorated". Mrs. Harber remained in the hospital for one week and then was discharged. She subsequently re-entered the hospital on December 8, 1962 for the removal of a tumor on the abdomen, which later proved to be malignant. Following recovery from the operation she was discharged from the hospital. She re-entered the hospital on February 18, 1963, and died on March 6, 1963 while there.

 Although the evidence shows that Mrs. Harber had extensive hospitalization toward the end of her life, there is no indication she was in a physical or mental condition which rendered her susceptible to

1. We recognize that California does not follow our rule that only the burden of going forward with evidence sufficient to rebut the presumption is shifted to the proponent, but rather there the burden of proving lack of undue influence is shifted to the proponent after the presumption is raised. Nevertheless, this does not negative our conclusion as to the type of activity by the beneficiary necessary to raise the presumption.

the exertion of undue influence upon her at the time of the execution of her will. It is necessary for the contestants to introduce sufficient evidence to show that the testatrix' will was overpowered and the will of another substituted in its stead, in order for a jury to find that the will was a product of undue influence. In re O'Connor's Estate, supra. The appellants, at the close of their case, withdrew their contentions that Mrs. Harber lacked testamentary capacity. This in itself indicates that Mrs. Harber was not susceptible to undue influence.

The contestants attempt to show susceptibility to undue influence by the fact that Mrs. Harber had vision problems. Mrs. Harber had a cataract operation several years before the execution of the will. There was testimony to the effect that she had trouble reading small print. However, it was undisputed that she was quite capable of driving an automobile. Even taken in the strongest light favorable to the contestants the evidence of Mrs. Harber's sight weakness does not indicate any susceptibility to undue influence.

The appellants contend that the will is "unnatural and unjust" since the bulk of Mary Harber's estate was to be distributed to Irene Foley and her children. It is admitted that an unnatural distribution of property by will may be a factor in determining whether undue influence was exerted upon the testatrix. See Anno. 154 A.L.R. 583. Whether we accept or reject the California rule that collateral heirs, who would take the property of the testatrix in the absence of a will, are not the natural objects of the testatrix' bounty, [In re Nolan's Estate, 25 Cal.App.2d 738, 78 P.2d 456 (1938)] is unimportant to the decision of this case. The evidence discloses that there is nothing unnatural about the distribution of the testatrix' property under the will.

The bulk of the estate was left to Irene Foley and her children. The evidence discloses that Dr. and Mrs. Harber raised Irene from childhood. In July, 1962 the couple signed a petition seeking the adoption of Irene Foley. The purpose of the attempted adoption was to secure to Irene the rights of inheritance belonging to a natural born child of the Harbers'. This adoption petition was not filed until one day before the death of Dr. Harber and action was never taken on it. In light of this petition and the history of the Harbers' relationship to Irene what could be more natural for Mrs. Harber than to leave most of her considerable estate to Irene and her children.

The will provided adequately for Mrs. Harber's aged and childless sisters and for her then living brother. Mrs. Harber, in her will, did not exclude any of her nieces and nephews. They all received handsome gifts considering the fact that she had not seen most of them in over twenty years. The evidence disclosed that when her relatives came to Phoenix for a visit she treated them very warmly. It is one thing to treat visiting relatives warmly and quite another to leave one's whole estate to them. If Mrs. Harber had left her whole estate to these collateral heirs then she would have cut off those persons who were closest to her. Simply because the collateral heirs do not receive all that they anticipate, or that they would be entitled to under the law of intestate succession, does not make the will unnatural.

The appellants also state that the will was prepared in secrecy and haste and that the testatrix received no independent advice. None of these contentions are supported by the evidence. As far as secrecy is concerned the will was executed in the Southwest Savings and Loan Association. It was witnessed by two disinterested parties. The fact that neither of these witnesses were called by the contestants is a fact that may be considered by the court. In re Greuner's Estate, 31 Cal.App.2d 161, 87 P.2d 872 (1939).

Marguerite Bennett, a sister of the testatrix and one of the contestants, testified that the testatrix never discussed the will with her. She further testified that Mrs. Harber did not inform her of her 1941 will

either. There is no obligation on the part of the testatrix to publish her will to all the world. Soumie v. McLean, 234 Or. 485, 382 P.2d 1 (1963). If Mrs. Harber had desired to discuss her will with her sister then she had ample opportunity to do so.

Mrs. Bennett testified that after the death of Dr. Harber she and her other sister, Rubie Baker, went to live with Mrs. Harber in order to look after her and keep her company. The testimony of Mrs. Bennett as to duration of this extended stay is indefinite. In any case it was admitted to be several months. In other words during most of the time that Irene and her husband Harry were working their "evil" upon Mrs. Harber, the testatrix' sisters were living with her as her constant companions and the Foleys were maintaining their own separate domicile. Even during Mrs. Harber's hospitalizations and her convalescence at home the sisters visited with her almost every day. No one prevented Mrs. Harber from seeing and talking with any of her friends or relatives. There was thus ample opportunity for the sisters to have observed and prevented any undue influence from being exercised upon the mind of the testatrix. Mrs. Bennett further testified that she knew of no undue influence exerted on the testatrix by the Foleys.

■ There is no evidence that the will was executed in haste. Dr. Harber died in the early part of August. The "first" will was executed in the first part of September. The "second" was executed in the middle of the month. The "third" was executed five weeks after the execution of the preceding will. It appears to us that the death of Dr. Harber prompted his wife to think of getting her affairs in order. The will of 1941 was hopelessly inadequate due to the changes in Mrs. Harber's financial condition and the effect that the grim reaper had on the family since the execution of that document. Mrs. Harber survived the execution of the will in question by four and one-half months. She therefore had sufficient time to change its provisions if they did not suit her.

■ As for the issue of independent advice there is no evidence that in the drafting and execution of the will in question Mrs. Harber received any advice at all. The evidence does not disclose that Irene or Harry Foley advised the testatrix on how she should dispose of her property. Any conclusion that they did so advise Mrs. Harber would be based merely on speculation and not on any competent evidence or any reasonable inference drawn from that evidence.

■ The appellants rely strongly on testimony of some of the contestants that on occasions prior to the execution of the will in question and subsequent to it the testatrix expressed a desire to have her property pass to the contestants upon her death. We stated in In re O'Connor's Estate, 74 Ariz. 248, 260, 246 P.2d 1063, 1071 (1952): "Had deceased over *many* years stated to *all of her friends* an intention to give her property to her nieces and nephews or to certain of them and had, under the circumstances here shown to exist, executed her will devising the property to Kelsey, then the inference of mental incapacity or undue influence would justify setting the will aside." (Emphasis added.) At most the statements which the testatrix was supposed to have made to these contestants are ambiguous. The testatrix is reputed to have said while speaking to a nephew on a visit from the East, "You know that this home is mine, and I think it will be enough for all of you here." By this statement she showed an intent to cut out of her largesse not only the proponents of the will, but also her own sisters, who lived in Phoenix. The statement does not mean that the testatrix intended to give all her property to her family in the East, but that she believed that the property she owned would be enough to cover the specific bequests which she had authorized in her will. The other statements are of a similar vein; none in clear and unambiguous language promising that the whole estate valued at about $1,500,000 would go to her sisters, brother, and nieces and nephews who maintained

ties with the testatrix but could certainly not be considered close to her by the very fact that she had not seen most of them in an extremely long period of time. Those relatives from the East whom she had seen were merely in Phoenix for brief visits.

■ After closely examining the contestants' evidence regarding the exertion of undue influence on the testatrix by the Foleys it is our conclusion that the trial judge was manifestly correct in directing the verdict in favor of the proponents following the presentation of the contestants' case. In the absence of sufficient evidence upon which reasonable men could draw an inference that undue influence had been exerted upon the testatrix and that the will was a product of that influence the case should not go to a jury. Mere suspicion, innuendo, insinuation and speculation are no substitute for evidence. Soumie v. McLean, supra. A jury verdict in a will contest that is based upon "nothing beyond speculation, suspicion and bottomless inference" [In re Estate of Pitt, 88 Ariz. 312, 318, 356 P.2d 408, 412 (1960)] will be set aside.

■ The contestants alleged in their petition to revoke probate that the Foleys had caused Mary Harber to execute the will in question "by falsely representing to her and causing her to believe that said will left substantially all of her property to her brother, sisters, nieces and nephews, when in truth and in fact it left substantially all of said property to Irene Foley and her children." This allegation amounts to an accusation of fraud perpetrated by the Foleys on Mrs. Harber. Fraud is never presumed and cannot be found to exist on a mere suspicion as to the possibility thereof. Brazee v. Morris, 68 Ariz. 224, 204 P.2d 475 (1949). There does not appear to us to be any good reason why the same rule should not prevail in a will contest. Gockel v. Gockel, Mo., 66 S.W.2d 867, 92 A.L.R. 784 (1933); 57 Am.Jur., Wills, § 386.

■ The appellant submits that the jury should have been allowed to infer fraud from the evidence already discussed above and the following additional factors: the will which was probated had certain misspellings of names and places; after the will was executed the testatrix is reputed to have told one of the contestants that she was planning on leaving certain antique furniture to Mrs. Kennedy to be used in the White House, and that her house was enough to take care of her people; and that Harry Foley misstated the amount of money left in Mary Harber's bank accounts at the time of her death when he was talking to the husband of one of the contestants. The statements made to the contestants by the testatrix have been considered in the portion of this opinion dealing with undue influence. No more significance can be attached to them as indicating fraud than in indicating undue influence. The other two factors are not nearly enough evidence of fraud to allow a jury to consider that question even in conjunction with the other evidence previously discussed in this opinion. Therefore the direction of the verdict against the contestants on the issue of fraud was correct.

Affirmed.

BERNSTEIN, C. J., STRUCKMEYER and UDALL, JJ., and WILLIAM A. HOLOHAN, Judge of the Superior Court, concur.

NOTE: The Honorable ERNEST W. McFARLAND, Justice, having disqualified himself, the Honorable WILLIAM A. HOLOHAN, Judge of the Superior Court, was called in to sit in his stead and participate in the determination of this case.