475 P.2d 732

### In the Matter of the ESTATE of Elizabeth E. FRICK, Deceased.

### Helen J. FAHRINGER, Contestant, Appellant,

v.

### Barney PIERCE and the First National Bank of Arizona, a national banking association, Contestees, Appellees.

### No. I CA–CIV 1103.

Court of Appeals of Arizona, Division 1, Department A.

Oct. 27, 1970.

Rehearing Denied Dec. 1, 1970.

Review Denied Jan. 12, 1971.

Richard Walraven, Prescott, and Mangum, Wall & Stoops, by Joyce Mangum, Flagstaff, for appellant.

Locklear & Wolfinger, by Harold J. Wolfinger, Prescott, for appellee Pierce.

Favour & Quail, by Joseph DePasquale, Prescott, for appellee First National Bank of Arizona.

DONOFRIO, Presiding Judge.

This is an appeal from a judgment notwithstanding the verdict and a conditional order for new trial entered in favor of appellees Barney Pierce (principal beneficiary) and the First National Bank of Arizona (executor) who were the proponents of the will of Elizabeth E. Frick, deceased, also referred to as testatrix. The trial court's conditional ruling on the motion for new trial was pursuant to 16 A.R.S., Rules of Civil Procedure, Rule 60(b), and granted a new trial to proponents in the event the judgment n. o. v. was later reversed or vacated.

The will, dated January 18, 1968, was contested by appellant Helen J. Fahringer, a niece of Mrs. Frick, on the grounds that the testatrix was at the time of the execution of her will incompetent or under the undue influence of the appellee Pierce, or both. For convenience the contestant Fahringer will hereinafter be referred to as appellant and the defendant to the contest, Pierce, will be referred to as appellee. The First National Bank of Arizona, also an appellee, will be referred to as the bank.

The trial proceeded before a jury as a contest of the will before probate. A.R.S. §§ 14–351 to 14–356. At the close of the evidence the court directed a verdict on the issue of incompetency and submitted the issue of undue influence to the jury. The jury returned its verdict in the affirmative that the will of Mrs. Frick was the product

of undue influence practiced upon her by appellee. After entering judgment on the verdict denying letters testamentary, the court granted the motion for judgment n. o. v. in favor of the bank and appellee.

Bearing in mind the rule, hereinafter discussed,· regarding the light in which the evidence must be viewed, we set forth the following factual background of this case.

The testatrix and her husband moved to Sedona, Arizona, from Southern California in 1963. Mr. Frick died in August 1965. The testatrix and appellant had been very close from the time of appellant's childhood. Appellant, who never married and was employed by a film studio in Hollywood, California, spent several vacations with testatrix both before and after Mr. Frick's death. Testatrix and appellant communicated with each other at least weekly, either by letter or by telephone. The relationship between appellant and her aunt, until approximately six months before testatrix' death, was described as that of mother and daughter.

Appellee, a bachelor, met testatrix in the fall of 1966 when Mrs. Frick came to his home soliciting funds for a Sedona library. The two saw each other several times that winter and by the spring of 1967 were seeing each other on a weekly basis. Their activities included fishing, hiking, picnicking, playing cards, dancing, etc. At this time appellee was 51 years of age and testatrix was 65. Although the appellee was at this time unemployed, he did have funds from other sources. By September of 1967 testatrix and appellee were seeing each other daily. Although one witness described testatrix' behavior as that of "a young schoolgirl in love", appellee indicated that he was merely a good friend of testatrix. In September 1967 Mrs. Frick had to have her left lung removed. Although she had a history of cancer, the breathing difficulties which she began experiencing in 1966 were not traced to a malignancy in her lung until just before the operation. This surgery was performed in Phoenix. Appellant had planned to vacation at testatrix' home in Sedona at about this time,

and though there is some conflict in the testimony concerning events occurring at the time of the sugery and shortly thereafter, it appears that immediately upon her arrival in Arizona appellant stopped overnight in Phoenix and visited testatrix at the hospital. Mrs. Frick indicated that because appellee was in Phoenix, appellant would be· most useful in Sedona looking after testatrix' home and pet dog. Shortly after Mrs. Frick's release from the hospital and return to Sedona, friction developed between appellant and her aunt. Harriet Bailey, a friend and neighbor of testatrix in Sedona, and also a friend of appellant, testified for appellant. On direct examination the following testimony was given:

"Q  Did she [testatrix] ever say to you that she was unhappy because Helen was not in the hospital or staying in Sedona?

"A  Maybe vaguely. I don't think it disturbed her much.

"Q  And what did disturb her, then. Was it the fact that Miss Fahringer did not invite Mr. Pierce to dinner?

"A  That seemed to be the thing that touched it all off.

"Q  And after this, did she make other statements to you about the situation?

"A  Yes, indeed.

"Q  Do you recall what they were?

"A  Well, Helen was going to be very sorry because she had taken the attitude she did toward Mr. Pierce and that was her story.

"Q  And what else did she say?

"A  Well, can you be specific about the time?

"Q  At the time; if you could place a time, and could you give us who was present, please?

"A  Well, she was most unhappy about it and at that time she threatened that Helen would be a very sorry girl that she had done this.

"Q  Okay.

"A  And at that time she was definitely going to change her Will.

"Q  Did she ever make any statements about Helen being jealous?

"A  Well, yes.  She did to me one day.

"Q  And when was that?

"A  She thought Helen was jealous of Barney because his age was closer to hers than Bess' age was.  She said, 'I think she is jealous because he doesn't make a play for her.'"

Appellant returned to Los Angeles shortly after Mrs. Frick's return to Sedona. Appellee continued to see Mrs. Frick daily from October through December 1967.  By January 1968 Mrs. Frick began to experience very frequent pain and by this time appellee was living in Mrs. Frick's home, assuming the major responsibility for her care until ultimately she succumbed to cancer on February 21, 1968.  Dr. Arthur W. Griesenbeck, the Sedona medical doctor who was testatrix' principal physician from October 1966 until her death, testified for appellee.  On cross-examination he related the following concerning appellee's proximity to testatrix during her last days:

"Q  Did you request that Mr. Pierce stay here?

"A  I told her that she obviously could not stay home without someone there.  And she said, 'Barney would stay.'

"Q  After the ninth of January would she have been incapable of staying by herself?

"A  Like I say, on January 5th is when she had this sudden severe unexplained pain in the left upper abdomen.  And I wanted to get x-rays but she didn't want to go to the hospital.  For a few days she definitely needed someone there.

"After that she was again able to be up and around and felt, I suppose, she could be home alone.  I was happy to know that someone was there who could call me in any emergency.

"Q  Did you ever advise her to get a nurse or anybody like that?

"A  I think we discussed it once, I would say perhaps two weeks before she died.  And she said, 'I don't really need one now.'  That was about two weeks before.  And approximately a day before she died when she was not able to get up out of bed someone would have to give her a bath in bed at that time.  And at that time I said, 'You better get a nurse.'  And she said, 'Okay.'  And we tried to get one through my office and weren't successful that day.  And then the next morning is when she died."

Testatrix died without issue.  She was survived by a brother, a brother-in-law, a sister-in-law, two nephews and three nieces, one of the nieces being the appellant.  Under the will the brother, brother-in-law, sister-in-law, and one nephew received general pecuniary legacies of $1,000 each. Two witnesses testified that the appellant, prior to appellee's appearance on the scene, was to be the major beneficiary of Mrs. Frick's will.  These witnesses, friends of testatrix, had heard Mrs. Frick mention this on several occasions in the course of casual conversation.  Under the will appellant received a general pecuniary bequest of $10,000 which was the largest general bequest aside from the testamentary gift to appellee of the residuary estate.

■   We turn to the applicable law.  Appellant urges that a confidential relationship between testatrix and appellee existed here which, coupled with other facts, gave rise to a presumption of undue influence. Some confidential relationships in conjunction with certain other facts do give rise to a presumption of undue influence.  In Re Estate of McCauley, 101 Ariz. 8, 415 P.2d 431 (1966).  As we are unable to find that such relationship and facts were present in the instant case (see infra), it was incumbent upon appellant to prove undue

influence by clear and convincing evidence. In Re Pitt's Estate, 88 Ariz. 312, 356 P.2d 408 (1960).

In the case of In Re Estate Of McCauley, supra, the Arizona Supreme Court in an opinion authored by Justice Lockwood gave the subject of undue influence a thorough treatment:

"The basic concept emerging from the mass of decisions on the subject of undue influence is that a person unduly influences a testator or testatrix in executing a will when that person through his power over the mind of the testator or testatrix makes the latter's desires conform to his own, thereby overmastering the volition of testator or testatrix. In re Reddaway's Estate, 214 Or. 410, 329 P.2d 886 (1958); In re Blake's Will, 21 N.J. 50, 120 A.2d 745 (1956); In re Jennings' Estate, 335 Mich. 241, 55 N.W.2d 812 (1952). See generally, 1 Page, Wills §§ 15.1 to 15.3 (Bowe-Parker edition 1960); 6 Powell, Real Property ¶ 948 (1958). Since undue influence is commonly exercised in secret, it may be established by circumstantial evidence. In re Westfall's Estate, 74 Ariz. 181, 185, 245, P.2d 951, 954 (1952). Whether undue influence has been exerted to bring about the making of a particular will is a question of fact. See In re Urich's Estate, 194 Or. 429, 242 P.2d 204 (1952). The burden of proving that a will has been procured by undue influence is on the contestant. In re Westfall's Estate, 74 Ariz. 181, 245 P.2d 951 (1952)." 101 Ariz. at 10, 415 P.2d at 433.

The opinion then set forth eight factors which the Court deemed significant in determining whether or not a will has been procured through undue influence:

"These factors include the following: Whether the alleged influencer has made fraudulent representations to the testatrix; whether the execution of the will was the product of hasty action; whether the execution of the will was concealed from others; whether the person benefited by the will was active in se-

curing its drafting and execution; whether the will as drawn was consistent or inconsistent with prior declarations and plannings of the testatrix; whether the will was reasonable rather than unnatural in view of the testatrix' circumstances, attitudes, and family; whether the testatrix was a person susceptible to undue influence; and whether the testatrix and the beneficiary have been in a confidential relationship. * * *" (Footnotes omitted) 101 Ariz. at 10–11, 415 P.2d at 433–434.

As we have stated, this is an appeal from judgment n. o. v., the jury having found that the will was the product of undue influence practiced on testatrix. If a motion for directed verdict is for any reason not granted, a party may move to have the verdict set aside and judgment entered in accordance with the motion for a directed verdict. The motion for judgment n. o. v. is a renewal of the motion for a directed verdict and is designed to permit the trial court, after more mature deliberation, to revise its ruling in denying the motion for a directed verdict. 16 A.R.S., Rules of Civil Procedure, Rule 50(b); In Re Schade's Estate, 87 Ariz. 341, 351 P.2d 173 (1960).

The test on granting a motion for judgment n. o. v. is the same as that pertaining to the direction of a verdict during the trial. In Re Thompson's Estate, 1 Ariz. App. 18, 398 P.2d 926 (1965). The evidence must be treated in a light most favorable to sustaining the jury's verdict. If there is any substantial evidence from which reasonable men could have found the ultimate facts to be such as to sustain the verdict, the motion for judgment notwithstanding the verdict should be denied. In Re Thompson's Estate, supra.

Our Supreme Court has noted that in will contests, more frequently than in other actions, juries are likely to render verdicts upon insufficient evidence. In Re Walters' Estate, 77 Ariz. 122, 267 P.2d 896 (1954). Upon review of a will contest where there is in issue the question wheth-

er there was sufficient evidence to support a verdict, the reviewing court must closely scrutinize the evidence. In Re Walters' Estate, supra. Accordingly, we will now apply the McCauley factors to the evidence in the instant case, considering the facts in a light most favorable to the appellant.

## 1. FRAUDULENT REPRE-SENTATIONS

Appellant attempts to show that appellee made fraudulent representations to the testatrix concerning his position in life, i. e., that he conveyed to testatrix the belief that he was impecunious and in ill health. One witness, in relating her conversation with testatrix, alleged that testatrix had at one time stated: "Poor Barney has it bad and he isn't well enough to work." Whatever impact this testimony might have had is largely lost when considered in relation to other evidence which showed that appellee was in sufficiently good health to do the yard work at testatrix' house and engage in other outdoor activity. Testimony of Harriet Bailey indicated that testatrix harbored no belief that appellee was poor:

"Q Did you ever have a discussion with Mrs. Frick about her relationship with Mr. Pierce?

"A Oh, a long while ago when she first started to go with him.

"Q Approximately when was that?

"A That would have been in the spring. At that time I am sure she didn't feel about him as she did later on. But I suppose it is normal for anyone to think—

"Q (Interrupting) What was the nature of the discussion you had at that time?

"A Well, it was just that it was a young man, younger than she was, running around with her and other widows in the area. And I said something about—asked her if he was paying his way. And she said, 'Oh, yes. Oh, he always pays his way.' But I know she felt the same

way; she knew that he was going with other people. * * *

* * * * * *

"Q Did she make any statements that no man would ever take her?

"A Oh, yes. You would have to know Bess to know why she would say that. She was very self-assured, and the first thing she thought of at that time we was talking about Barney paying his own way, she said, 'No man is ever going to take me for my money,' or some remark of that type. That was the very remark that was represented."

In a will contest fraud is never presumed and cannot be found to exist on a mere suspicion as to the probability thereof. In Re Harber's Estate, 102 Ariz. 285, 428 P.2d 662 (1967). Here the evidence of fraud was not developed to a point beyond that of mere suspicion.

## 2. PRODUCT OF HASTY ACTION

Appellant neither urges, nor does the evidence indicate hasty action in the drafting and execution of the will.

## 3. CONCEALMENT OF EXECU-TION OF WILL

Although testatrix asked Harriet Bailey not to inform appellant of changes she had made in her will, the fact that the execution of the new will was revealed to Mrs. Bailey, a good friend of both appellant and testatrix, is evidence that the execution was not concealed. There was no particular reason why execution of the new will should have been revealed to appellant. Still, in a letter dictated by the testatrix to Harriet Bailey, which letter was addressed to appellant, testatrix revealed her testamentary wishes:

"Sedona, Arizona
Feb. 16, 1968

"Dear Helen:

I am sending your Mother's pearls and a few other things, and am also including the one gold piece I think you would appreciate.

I am sending them now so they won't get lost in the shuffle around here.

I have made some changes in my will and among other things I am leaving the house and Rusty to Barney.

Anything I would leave him would never pay him for his devotion and care these past six months. I have instructed Barney where all my personal belongings are to go and they are all marked and ticketed.

I am having Harriett type this as I am not able to write much now. Some days I am not too bad and other days the pain is unbearable.

> Love,
> /s/ Bess"

## 4. BENEFICIARY ACTIVITY IN SECURING THE DRAFTING AND EXECUTION OF WILL

In Re Estate of McCauley, supra, cites In Re Westfall's Estate, 74 Ariz. 181, 245 P.2d 951 (1952) for the proposition that an indication of undue influence is activity by the principal beneficiary in securing the drafting and execution of the will. In Westfall, supra, the proponent of and primary beneficiary under the contested will hired an attorney and furnished him with the provisions to be incorporated in the will of testatrix, her employer, a sickly woman over eighty years old.

In the case at bar the evidence cited by appellant in support of her assertion that appellee was active in procuring the will is meager both in character and quantity. Appellee admitted that he and testatrix had discussed their respective wills on various occasions. Though the evidence shows that appellee drove testatrix to her attorney's office and to the bank where the will was deposited, it should be noted that at this time appellee was chauffeuring testatrix on numerous errands, including trips to the beauty shop and market. Appellee was never in the office of Gary L. Yahnke, the attorney who prepared the will, and in fact appellee and Mr. Yahnke never met during testatrix' lifetime. Ann Stadelman, a legal secretary employed during this period by Mr. Yahnke's firm, Favour & Quail, was a witness for appellee. On direct examination she was questioned regarding appellee's proximity to testatrix on various occasions:

"Q Now, Mrs. Stadelman, on the occasion that you went to see Mrs. Frick in the hospital and discussed the Will with her, was Barney Pierce at the hospital on that occasion?

"A Yes, sir.

"Q And where was he?

"A He was visiting with Mrs. Frick when I entered the room.

"Q And were you introduced to him at that time?

"A Yes, I was.

"Q And after you were introduced, what happened?

"A Mr. Pierce immediately left the room.

"Q Was he in the room when you had your discussions with Mrs. Frick concerning the Will?

"A No, he was not.

"Q On January 3rd, 1968, was Mr. Pierce, or did you see Mr. Pierce on that day when the Will was signed?

"A No. He was not in the office, never.

"Q On January 18th, when the third Will was executed, was Barney Pierce or Mr. Pierce in the office of Favour and Quail?

"A No, sir.

"Q Since the time you have been a Legal Secretary for Favour and Quail in the Sedona office, has Barney Pierce ever been in the office up until the time of Mrs. Frick's death?

"A No, sir.

"Q Has he to your knowledge ever been a client of Favour and Quail?

"A Not to my knowledge, sir."

## 5. CONSISTENCY OR INCONSISTENCY WITH PRIOR DECLARATIONS AND PLANNING

It is evident from the testimony in this case that it was testatrix' intention for a number of years that appellant would be the primary beneficiary of her estate. Then, in late September and early October of 1967 there was a change in testatrix' attitude toward appellant. This "falling out" occurred, as has been previously noted, after appellant indicated her displeasure with the position of importance that appellee was assuming in testatrix' life. After early October 1967, and until her death, testatrix' declarations concerning her testamentary intent consistently referred to planned changes in her will and to her desire to leave a substantial portion of her estate to the appellee. Ann Stadelman testified concerning a conversation she had with testatrix on December 26, 1967, in the office of the attorney who drafted testatrix' will:

"Q And what did she tell you about her niece at that time?

"A She said this was the reason she was in to change the Will that she had previously drawn, and that she wanted to change it because her niece had not performed her promise as she had promised her, and she felt she wanted to change her Will to the information she was about to give me.

"Q And what promise was it; did she mention or tell you what the promise was that her niece had made?

"A She said that her niece had promised her that she would take care of her in her last illness.

"Q And did she tell you that this was the promise that her niece had not fulfilled?

"A Yes.

"Q And at that particular time when she came into the office on the 26th day of December, 1967, did you take the information from her for the preparation of her Will?

"A I did.

"Q And did it appear to you at that time from your conversation with her and from the information that she had furnished you that she knew what she was doing and that she was of sound mind at the time?

"A I would say she was.

Harriet Bailey also spoke of a conversation she had with Mrs. Frick on this subject:

"Q Now, in February, about the 16th of February, did you have any conversations with Mrs. Frick about her disposing of her property?

"A Yes. She seemed to want to talk about it all the time. And I don't know; I can't pinpoint the time; but this one afternoon she was sitting there and she asked me; she had told me what she had done about the Will and wanted to know if I thought she had adequately provided for Mr. Pierce.

"She said, 'I want to'—I think she felt that he was not able to work because she said she wanted to provide for him so that he wouldn't have to work again. She felt he was not able to go to work, whether he was or not; that is what she told me.

"She said, 'Do you think I have provided for him adequately?' I said, 'For the time you have known him, I think that's darn good pay.' And she said, 'that is the way I want it.' And I had no interest in it. So, it didn't—I had known her before Jake died, before her husband died. I knew things were different then. She was a very ill woman and I wouldn't have said anything to cross her."

## 6. REASONABLENESS OR UNNATURALNESS IN VIEW OF CIRCUMSTANCES, ATTITUDE, AND FAMILY OF TESTATRIX

We have stated that Mrs. Frick died without issue. Testatrix' collateral heirs

were not ignored under her will. Five of her eight collateral heirs, including appellant, were beneficiaries under the will. Under these facts and the circumstances of this case we are not given any evidence that this testamentary disposition was unreasonable or unnatural.

## 7. SUSCEPTIBILITY OF TESTATRIX TO UNDUE INFLUENCE

Appellant paints a picture of the testatrix as a person readily susceptible to undue influence commencing from the time of her cancer surgery and continuing until her death. There are in the record, however, the statements of Mrs. Frick's physician and of her lawyer, among others, to the effect that Mrs. Frick was a strong-willed woman and not indecisive or easily swayed in her opinions. Dr. Griesenbeck testified:

"Q Doctor, at any time you saw Mrs. Frick did you observe that she was under the supervision or control in any manner of Mr. Pierce?

"A No, I would say not. Of course, my dealings with her were always direct. I talked to her usually with her alone in my office.

"And later at home Mr. Pierce was never in the room when I was talking, treating or examining her. He would be in the kitchen. And usually, I would talk about her condition before I went in and then talk to him afterwards as to what may happen. But I always talked to her directly without him being present or anyone else being present, other than the nurse.

"I would say at all times that she appeared to be making up her own mind.

"Q Based on your contacts with him, putting it a different way, she always had this independence of mind and healthy attitude you spoke of before?

"A I would say so."

Dr. Griesenbeck was queried concerning his observation of testatrix on January 18, 1968, the day the contested will was executed:

"Q Doctor, based on your treatment of Bess Frick over the years and your observation of Bess Frick and your treatment and examination of her on January 18th, 1968, do you have an opinion as to whether or not Bess Frick, Mrs. Frick's physical condition was such that she would be susceptible to any undue influence by any person on that day?

"A Well, I would say—

"Q Will you just answer if you do have an opinion?

"A I would say she was not susceptible to undue influence."

Mr. Yahnke, the attorney who drafted the will was questioned in regard to the circumstances surrounding the execution of the will:

"Q Let's go back to January 18th, 1968. Did you at that time have any conversations with Mrs. Frick concerning the Will which she executed on January 18th?

"A Yes, I did.

"Q And where did these conversations take place or where did this conversation take place?

"A In my office.

"Q Was anybody else present when you discussed the Will with her?

"A No, sir.

"Q Would you tell the Court and Jury what your conversations were with her on that day concerning her Will?

"A On the 18th I again reviewed the provisions of the Will which she executed on January 18th, with her; examined the provisions in the Will. Mrs. Frick; I believe it was on this occasion on the 18th; Mrs. Frick commented on an illness that she had had in the past. I don't recall the time period. And she mentioned

that her niece, Helen Fahringer; she had asked Miss Fahringer to stay with her during the time of her illness, and she expressed her disappointment to me that Miss Fahringer had not come over to Arizona to stay with her at that time.

"Q  For what reason did she give you this information?

"A  For no specific reason or purpose that I can identify. I do recall that she also mentioned that under these circumstances she felt that she was being generous with Miss Fahringer under the provisions of the Will.

"Q  Did you discuss with Mrs. Frick the other beneficiaries of the Will in so far as the shares of the property that they were to receive, shares of her estate?

"A  I recall that she mentioned that Barney Pierce, one of the beneficiaries under the Will, had been a very good friend of hers. That is the only other beneficiary I can recall specifically.

"Q  Did it appear to you that she had any difficulty understanding or knowing what she was doing when she gave you the information for the preparation of the Will or when you reviewed it with her?

"A  No, she had no trouble at all.

"Q  Do you have an opinion from your observations on that day and from your conversations with her on that day, whether she was of sound and disposing mind when she executed that Will?

"A  Yes.

"Q  And what was your opinion?

"A  That she was.

"Q  From your observations of her on that particular day on January 18th, 1968, was there any evidence dis-

played to you that she was acting under any undue influence?

"A  No, none at all."

Harriet Bailey expressed similar sentiments:

"Q  Now, you have described Bess as a woman who knew her own mind; right?

"A  Yes, sir.

"Q  Very definitely?

"A  Yes, sir.

"Q  She made her own decisions?

"A  After her husband died, yes.

"Q  And knew what she liked; what she wanted. I mean; you didn't have to do any thinking for her?

"A  No. She often talked to me and consulted me about things after he died. But as far as Bess, herself, is concerned, she definitely knew what she wanted and she didn't mind telling you about it.

"Q  And from what you have indicated, you went about as far as you thought you dared to go in explaining what your ideas were about what she should do?

"A  Yes, one word with me and I would have been in Helen's department, I am sure."

## 8. A CONFIDENTIAL RELATIONSHIP BETWEEN TESTATRIX AND BENEFICIARY

The relationship involved in creating a presumption of undue influence has been held to be a "confidential" one. In Re Pitt's Estate, supra. "Some confidential relationships in conjunction with other basic facts, such as proponent's activity in procuring the execution of the will and his being named as its principal beneficiary, give rise to a presumption of undue influence." In Re Estate Of McCauley, supra. The Arizona Supreme Court has said that it recognizes no distinction between

confidential and fiduciary relationships since, in the context of proving undue influence in will contests, courts have used the terms synonymously. In Re Estate Of Harber, supra. We cannot find that a "confidential relationship", as that term has been interpreted in this context, existed between testatrix and appellee. Although appellant alleges that such relationship did arise as a result of the existence of a trustee bank account established by the testatrix, the facts show that testatrix retained exclusive control over the account until her death.

In order to sustain a finding of undue influence there must be a sufficient showing that the mind of a testator was overpowered at the very time that the will was executed. In Re Estate Of Harber, supra; In Re Pitt's Estate, supra; In Re O'Connor's Estate, 74 Ariz. 248, 246 P.2d 1063 (1952). Recognizing as we do, on the one hand that no satisfactory mechanical test or tests can be applied in a will contest, and that a verdict which finds the exercise of undue influence should be upheld if supported by any substantial evidence, we must, on the other hand, point out that a jury should not be allowed to negate a will merely because it questions the propriety of the testamentary disposition. In Re Estate Of Harber, supra, In Re Walters' Estate, supra; In Re Estate of Smith, 53 Ariz. 505, 91 P.2d 254 (1939).

We find that the evidence was not sufficient to support a verdict that testatrix' will was the product of undue influence exercised by the appellee. We hold, therefore, that the granting of the motion for judgment notwithstanding the verdict was correct.

Affirmed.

STEVENS, J., and WILLIAM C. FREY, Judge of Superior Court, concur.

NOTE: Judge JAMES DUKE CAMERON having requested that he be relieved from consideration of this matter, Judge WILLIAM C. FREY was called to sit in his stead and participate in the determination of this decision.